HAGEL, Judge,
with whom SCHOELEN, Judge,
joins, concurring in part and dissenting in part:
I concur with the majority’s decision in Part III.A, regarding the Board’s finding of fraud; Part III.B, regarding the applicability of 31 U.S.C. §§ 3801-3812 and 38 C.F.R. § 42.1; and Part III.E, vacating and remanding Mr. Roberts’ claim for benefits for dysthymia and depression on a direct basis. I must dissent, however, from the remainder of the majority’s decision.
This case deals with the bedrock of veterans’ entitlement to benefits: All veterans who have honorably served our country are entitled to fair process in the adjudication of their claims, regardless of their postservice activities. The majority allows its distaste for the postservice conduct of an honorably discharged veteran to cloud its view of his entitlement to the applicable evidentiary and procedural protections provided for by VA’s regulations. The majority permits VA to deny this veteran proper process in the severance of benefits that he had been receiving for more than 10 years and gives VA a pass on its failure to assist the veteran in developing existing evidence of other stressors that would support the continuance of service connection for post-traumatic stress disorder and the associated disability compensation.
A. Application of 38 C.F.R. § 3.105(d)

1. Unexplained reversal of regulatory interpretation by VA.

In a case that relies so heavily on regulatory interpretation, the majority opinion contains one glaring omission: The majority fails to adequately account for and dispel the Secretary’s abrupt change in position on the applicability of § 3.105(d). The majority’s contention that the Secretary had no longstanding position on this issue rests on a faulty premise — that in response to the Court’s August 5, 2009, request for further information, “the Secretary averred that no written guidance existed regarding this situation, either at the time of the August 2005 Board decision, or at any time thereafter.” Ante at 429. In fact, the Secretary advised the Court that the only written policies and procedures he could locate involved the severance of service connection generally, and that he could find no specific policies and procedures relating to severance of protected service connection due to fraud. Secretary’s Response to Aug. 5, 2009, Order at 2 — 4. Rather than conclude, as the majority does, that lack of procedure pertaining to this specific subset of severance proceedings means that the Secretary has no policy regarding these proceedings, I conclude that no separate policies or procedures for severing service connection (whether protected or not) based upon fraud exist because VA has regularly applied the two-step process it applied in this case to all cases of severance; that is, VA first determines whether, based upon fraud, the removal of protection is warranted under § 3.957 and then, if so, VA applies the procedural and evidentiary requirements of § 3.105(d). See Secretary’s Response to Aug. 5, 2009, Order at Exhibit L, M (Board decisions of 1998 and 2006 indicating that the two-step analysis is proper). Additionally, the Secretary *433 states (and the majority agrees) that a consistent position on this issue could not be discerned from prior cases because the Board has only twice addressed severance of service connection resulting from fraud. This statement rings hollow: Not only does the Secretary overlook Mr. Roberts’ case (not to mention Ventigan v. Brown, 9 Vet.App. 34 (1996), which concerned dependency and indemnity compensation), but the Secretary also fails to comprehend that where a particular course of action has been followed in all cases in which a matter was considered, that course of action with respect to that matter can be said to be consistent.
My view that the Secretary’s position, that severance of benefits is entitled to the protection of the procedures of § 3.105(d) even in cases of fraud, is longstanding is bolstered by his position in Ventigan, a 1996 case upon which the majority places great reliance. That case involved the attempted severance, based on fraud, of dependency and indemnity compensation benefits; the Board applied § 3.105(d) to that determination, and the Secretary defended that position before the Court.[7] 9 Vet.App. at 36.
Moreover, throughout the adjudication of this matter, VA has complied or attempted to comply with § 3.105(d). See R. at 1328-35 (August 2004 rating decision proposing severance and “setting forth all material facts and reasons” for the proposed severance (§ 3.105(d))); R. at 1337-40 (August 2004 regional office letter advising Mr. Roberts of the 60-day time-frame for submitting additional evidence, that he had the right to request a hearing, and that he had the right to be represented); R. at 23-24 (August 2005 Board decision stating that the severance of Mr. Roberts’ service connection was governed by § 3.105(d)). In addition, in the more than four years that Mr. Roberts’ appeal has been before the Court, the Secretary has consistently argued that § 3.105(d) applied. The parties submitted multiple briefs and the Court conducted oral argument before a panel of three judges in October 2008, and at no time did the Secretary even suggest that the evidentiary and procedural protections for severing service connection contained in § 3.105(d) are inapplicable in cases of protected service connection where the basis for severance is fraud. Indeed, it was not until the second oral argument in July 2009 that the Secretary took the litigating position that the preamble of § 3.105 wholly exempted § 3.105(d) from application in the case of fraud, reversing his long-held position to the contrary. See Roberts v. Shinseki, No. 05-2425, 2009 U.S. Vet.App. Lexis 1170 (June 8, 2009, per curiam order); Secretary’s Response to June, 8, 2009, Court Order.
It is well settled that agency positions adopted in response to litigation, or those adopted as a “ ‘post hoc rationalization’ advanced by an agency seeking to defend past agency action against attack” are not entitled to deference from the Court. Auer v. Robbins, 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (quoting Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 212, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988)); Martin v. Occupational Safe *434 ty & Health Review Comm’n, 499 U.S. 144, 156, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) (“ ‘[Litigating positions’ are not entitled to deference when they are merely appellate counsel’s ‘post hoc rationalizations’ for agency action, advanced for the first time in the reviewing court.”). It is telling that in its recitation of the parties’ arguments, the majority dedicates but a footnote to note merely that “[t]he Secretary acknowledges that this position [that § 3.105(d) does not apply in this case] differs from his initial presentation to the Court.” Ante at 422 n. 2. The fact that the majority has failed to call the Secretary to account for abruptly reversing his four-year-long position in this litigation suggests to me that the majority’s decision is based less on an impartial view of the matter before the Court and more on a desire to punish a veteran who committed fraud after discharge, regardless of VA’s failure to afford the veteran VA’s own prescribed evidentiary and procedural protections. Moreover, as explained below, the majority’s position directly opposes the manner in which Congress has determined this situation should be handled.

2. Intei"pretation of 38 C.F.R. § 3.105 and effective dates.

Debile fundamentum fallit opus: Where there is a weak foundation, the work fails.
—Bouvier’s Law Dictionary and Concise Encyclopedia, at 2131 (3d rev.1914)
A large part of the majority’s decision rests on an erroneous interpretation of what can best be described as the preamble to 38 C.F.R. § 3.105.[8] The majority insists that the preamble exempts all provisions of § 3.105 from application in the event of fraud, but that analysis proceeds from the incorrect presumption that the regulatory language is ambiguous. Where the plain language of the regulation is clear, however, such reliance is misplaced. Meedel v. Shinseki, 23 Vet.App. 277, 280 (2009) (citing Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979) (“We begin with the language of the [ ] Act itself.”)); Tropf v. Nicholson, 20 Vet.App. 317, 320 (2006) (“If the meaning of the regulation is clear from its language, then that is ‘the end of the matter.’ ” (quoting Brown v. Gardner, 513 U.S. 115, 120, 115 S.Ct. 552, 130 L.Ed.2d 462 (1994))); see also Black & Decker Corp. v. Comm’r of Internal Revenue, 986 F.2d 60, 65 (4th Cir.1993) (“Regulations, like statutes, are interpreted according to the canons of construction.”).
Here, the plain language of the preamble refers only to effective dates for severance or discontinuance of benefits:
The provisions of this section apply except where an award was based on an act of commission or omission by the payee, or with his or her knowledge (§ 3.500(b)); there is a change in law or a Department of Veterans Affairs issue, or a change in interpretation of law or a Department of Veterans Affairs issue (§ 3.114); or the evidence establishes *435 that service connection was clearly illegal. The provisions with respect to the date of discontinuance of benefits are applicable to running awards. Where the award has been suspended, and it is determined that no additional payments are in order, the award will be discontinued effective date of last payment.
38 C.F.R. § 3.105 (2009) (emphasis added). The relevant portion of § 3.500, which generally governs reductions and discontinuances, provides:
(b) Error; payee’s or administrative (38 U.S.C. 5112(b), (9), (10)).
(1) Effective date of award or day preceding act, whichever is later, but not prior to the date entitlement ceased, on an erroneous award based on an act of commission or omission by a payee or with the payee’s knowledge.
38 C.F.R. § 3.500(b)(1) (2009).[9] The relevant portion of § 3.114 provides:
(b) Discontinuance of benefits. Where the reduction or discontinuance of an award is in order because of a change in law or a Department of Veterans Affairs issue, or because of a change in interpretation of a law or Department of Veterans Affairs issue, the payee will be notified at his or her latest address of record of the contemplated action and furnished detailed reasons therefor, and will be given 60 days for the presentation of additional evidence. If additional evidence is not received within that period, the award will be reduced or discontinued effective the last day of the month in which the 60-day period expired.
38 C.F.R. 3.114(b) (2009) (emphasis added). The citation of these two regulations, in addition to the effective-date provisions included in the final two sentences of the preamble, makes it clear that the preamble language acts to substitute the application of the effective-date provisions contained in § 3.105 with other effective-date provisions in certain enumerated circumstances. For example, where, as here, an award of benefits was based on an act of commission or omission, the effective-date provision for severance of service connection provided under § 3.105(d) is substituted with that of § 3.500(b). Thus, severance takes place as of the effective date of the award of benefits, rather than as of “the last day of the month in which a 60-day period from the date of notice to the beneficiary of the final rating action expires.”[10] 38 C.F.R. § 3.105(d). Because the plain language of the regulation provides otherwise, there is no basis for the majority’s view that § 3.105(d) does not apply in Mr. Roberts’ case.

3. VA’s affirmation of its longstanding interpretation of 38 C.F.R. § 3.105.

The majority takes great pains to recount the regulatory history of § 3.105, *436 but wholly fails to take into account that the Secretary’s clearest and most current published interpretation of this regulatory provision is contrary to his current litigating position and the majority’s interpretation of § 3.105. In May 2007, the Secretary proposed, by publication in the Federal Register, “to reorganize and rewrite in plain language general provisions applicable to [VA’s] compensation and pension regulations, including general evidence requirements, general effective dates for new awards, revision of decisions, and protection of existing ratings.” 72 Fed.Reg. 28,770 (May 22, 2007).
In its revision, VA intends to clarify and recodify 38 C.F.R. § 3.957 and the provisions of 38 C.F.R. § 3.105(d) that govern when service connection may be severed at 38 C.F.R. § 5.175, entitled “Protection or severance of service connection.”[11] That section provides:
(a) Protected service connection.
(1) VA may not sever service connection that has been in effect for 10 years or more unless evidence shows that:
(i) The original grant was obtained through fraud, or;
(ii) It is clear from military records that the person identified as a veteran did not have the requisite qualifying military service or the veteran’s discharge from service is of a type to prevent service connection as described in § 5.30.
(b) Severance of service connection.
(1) VA will sever service connection when evidence establishes that it is clearly and unmistakably erroneous (the burden of proof being upon VA) subject to §§ 5.152 and 5.176.
(2) A change in diagnosis may be accepted as a basis for severance of service connection if the examining physician or physicians or other proper medical authority certifies that, in the light of all accumulated evidence, the diagnosis that was the basis of the award of service connection is clearly erroneous. This certification must be accompanied by a summary of the facts, findings, and reasons supporting the conclusion that the diagnosis is erroneous.
72 Fed.Reg. 28,792-93 (proposed May 22, 2007) (to be codified at 38 C.F.R. § 5.175).
The due process procedures for severing service connection will be recodified in their own section, § 5.176, which restates the procedural requirements of § 3.105(d) for severing service connection and § 3.105(e) for reducing or discontinuing compensation benefits. See 72 Fed.Reg. 28,783. That regulation states:
Except as provided in § 5.83(c),[12] when VA is contemplating severing service connection or reducing or discontinuing compensation benefit payments (including those based on individual unemploy-ability), VA will:
(a) Prepare a rating proposing severance of service connection or reduction or discontinuance of compensation benefit payments and setting forth all material facts and reasons;
(b) Consistent with § 5.83, notify the beneficiary at his or her latest address *437 of record of the contemplated action and furnish detailed reasons therefor; and
(c) Allow the beneficiary 60 days from the date of the notice proposing severance, reduction, or discontinuance, to present additional evidence to show that service connection should be maintained, the rating should not be reduced, or the benefits should remain intact. If VA receives no additional evidence within the 60-day period, or the evidence received does not demonstrate that the proposed action should not be taken, VA will notify the beneficiary that VA is severing service connection or reducing or discontinuing the benefit.
72 Fed.Reg. 28,793 (proposed May 22, 2007) (to be codified at 38 C.F.R. § 5.176). I note that nowhere in proposed § 5.176 does VA exclude cases of severance of service connection based on fraud from the due process procedures contained therein.
Finally, VA proposes to extract the effective-date provisions from § 3.105(d) and (e) for severance of service connection and reduction or discontinuance of benefits. In its explanation of the changes, VA states:
We propose in paragraph (a) to restate the provisions found in the introductory paragraph of § 3.105 regarding effective dates for reductions or discontinuances of suspended awards. We propose in paragraph (c) to list the three exceptions to § 5.177, which are derived from the introductory paragraph of § 3.105 and current § 3.500(b). We propose not to include the exception for cases where the award of service connection was “clearly illegal” because such cases would properly fall within § 3.105 and proposed § 5.177(d). We propose in paragraphs (d) through (i), to state the specific type of benefit that is the subject of the particular effective date rule and to explain when the benefit will be reduced, stopped, or severed. These effective date provisions are from paragraphs (c) through (h) of the current version of § 3.105.
72 Fed.Reg. 28,783 (emphasis added).
Section 5.177 provides, in relevant part:
Effective dates for severing service connection or discontinuing or reducing benefit payments.
(c) Exceptions. This section does not apply if:
(1) There is a change in law or a VA administrative issue or a change in interpretation of law or VA issue; if so, § 5.152 applies (effective dates based on change of law or VA issue);
(2) An aivard was erroneous due to an act of commission or omission by the beneficiary or with the beneficiary’s knowledge; if so, § 5.165(b) applies; or
(3) An award was based solely on administrative error or an error in judgment by VA; if so, § 5.165(c) applies in cases other than severance of service connection under paragraph (d) of this section or reduction of compensation under paragraph (f) of this section.
(d) Severance of service connection. This paragraph (d) applies when VA severs service connection. In such cases, two 60-day periods apply. After applying the 60-day notice period described in § 5.176, VA will sever service connection effective the first day of the month after a second 60-day period beginning on the day of notice to the beneficiary of the final decision.
*438 72 Fed.Reg. 28,793 (proposed May 22, 2007) (to be codified at 38 C.F.R. § 5.177) (emphasis in subsection (c)(2) added).
Section 5.165(b), which is a recodification of § 3.500(b) (see 72 Fed.Reg. 28,779),[13] in turn provides:
(b) Effective date of reduction or discontinuance based on beneficiary error. If an award was based on an act of commission or omission by the beneficiary or any act of omission or commission with the beneficiary’s knowledge, VA will pay a reduced rate or discontinue benefits effective the latest of the following dates:
(1) The effective date of the award;
(2) The date preceding the act of commission or omission; or
(3) The date entitlement to the benefit ceased.
72 Fed.Reg. 28,790 (proposed May 22, 2007) (to be codified at 38 C.F.R. § 5.165).
The Secretary asserted at oral argument before the full Court in July 2009 and in filings immediately thereafter that these changes, particularly the change extracting the preamble language from § 3.105 and codifying it separately at § 5.176 (governing effective dates for reductions or discontinuances of awards based on error), constitute substantive changes in the Government’s interpretation of this regulation. The explanatory text of the Secretary’s proposed regulations betrays him, however. VA stated that
[although these regulations have been substantially restructured and rewritten for greater clarity and ease of use, most of the basic concepts contained in these proposed regulations are the same as in their existing counterparts in 38 C.F.R. part 3. However, a few substantive differences are proposed....
Readers who ... observe substantive changes between [existing regulatory provisions and proposed provisions] should consult the text that appears later in this document for an explanation of significant changes in each regulation.
72 Fed.Reg. 28,771-28,772. It is clear from this statement that, where VA intended substantive changes to a regulation, those changes are expressly explained in the text of the document.[14] There is no *439 such explanation indicating that the rewriting and restructuring of the regulations at issue here are intended as substantive changes. The Secretary’s proposed reorganization and rewrite of part 3 removes the preamble language from § 3.105 and separately codifies it in a section that governs effective dates, which only serves to support both the plain language reading of the preamble of § 3.105 that I outline above, as well as the Secretary’s longstanding position on the applicability of § 3.105(d). The Secretary’s position is pointedly emphasized by his consistent interpretations of these regulations in this case between August 2005 and May 2009. Consequently, there can be no question that the majority has erred in its determination that § 3.105(d) does not apply to Mr. Roberts’ appeal.
B. Majority’s Interpretation of 38 C.F.R. § 3.957
The majority holds that the Board need not have applied § 3.105(d), its finding regarding that regulation’s applicability notwithstanding, because § 3.957 permits VA to sever service connection on the basis of fraud alone. I disagree. The relevant portion of § 3.957 is worth restating:
Service connection for any disability or death granted or continued under title 38 U.S.C., which has been in effect for 10 or more years will not be severed except upon a showing that the original grant was based on fraud or it is clearly shown from military records that the person concerned did not have the requisite service or character of discharge. The 10-year period will be computed from the effective date of the Department of Veterans Affairs finding of service connection to the effective date of the rating decision severing service connection, after compliance with § 3.105(d).
The majority takes the position that § 3.957 requires “compliance with § 3.105(d) ... only with regard to computing the 10-year period for determining whether an award is protected from severance.” Ante at 425. The majority ignores, however, that the plain language of the regulation indicates that the 10-year period cannot be calculated until after the severance proceedings are completed— otherwise the “effective date of the rating decision severing service connection” cannot be determined — which requires compliance with the procedures of § 3.105(d). Moreover, the majority asserts, in essence, that the two sentences of § 3.957 are unrelated, in that, despite specific citation thereto, compliance with § 3.105(d) is not required where it is shown that the original grant of benefits was based on fraud. That view is simply incorrect and unsupported by common sense, the regulation’s plain language, and the Secretary’s consistent interpretation of the regulation.
The regulation provides that service connection in effect for more than 10 years “will not be severed” except, as relevant here, where the original grant is shown to have been based on fraud. 38 C.F.R. § 3.957 (emphasis added). It does not say that where the original grant of service connection is shown to have been based on fraud, service connection will be severed. Thus, the language of the regulation suggests that a finding of fraud is only a first step in the process of severing service connection; it is, essentially, a threshold matter that removes the protection otherwise afforded to service connection that has been in effect for more than 10 years. In other words, the second sentence of § 3.957 simply explains that the 10-year period cannot be calculated absent a rating decision severing service connection, and states that the rating decision severing service connection must be the result of compliance with § 3.105(d). Indeed, not *440 even the Secretary disputes this interpretation. See Secretary’s Response to June, 8, 2009, Court order at 1, 6. Further, this interpretation is supported by VA’s Adjudication Procedure Manual (M21-1MR). See M21-1MR, pt. III, subpt. iv, ch. 8, sec. c (“Under 38 C.F.R. [§ ] 3.957, if service connection for disability or cause of death has been in effect ten or more years, propose severance only if the original grant was based on fraud .... ” (emphasis added)); see also Secretary’s Response to Aug. 5, 2009, order, Exhibit G. Because VA interprets § 3.957 to mean that severance of otherwise protected service connection may only be proposed, not effectuated, upon a showing of fraud, and because that interpretation is reasonable and consistent with the regulation, the majority ought not supplant the Secretary’s interpretation with its own. See United States v. Cleveland Indians Baseball Co., 532 U.S. 200, 202, 121 S.Ct. 1433, 149 L.Ed.2d 401 (2001) (holding that an agency’s longstanding interpretation of its own regulations is entitled to “substantial judicial deference”); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945) (holding that an agency’s interpretation of its own regulations is controlling unless that interpretation “is plainly erroneous or inconsistent with the regulation”).
Because the majority holds that a finding of fraud alone is sufficient to allow VA to sever service connection under § 3.957, and because the majority ultimately concludes that the important evidentiary and procedural protections of § 3.105(d) are not applicable to cases of severance of service connection based on fraud, it never reaches the question of the proper interpretation of § 3.105(d). Because I believe the majority’s conclusion in both regards is incorrect, I will review the Board’s decision in light of what I believe is the proper application of § 3.105(d).
C. The Board’s Application of 38 C.F.R. § 3.105(d)
The Board first noted that § 3.105(d) was the proper regulation under which to analyze this matter and then stated that the “same [clear and unmistakable error] standard which applies to a veteran’s [clear and unmistakable error] challenge to a prior adverse determination under [§ ] 3.105(a) is also applicable in the Government’s severance determination under [§ ] 3.105(d).” R. at 23-24 (citations omitted). The Board then outlined the requirements for finding clear and unmistakable error in a prior decision. R. at 24 (citing Damrel v. Brown, 6 Vet.App. 242 (1994) and Russell v. Principi, 3 Vet.App. 310 (1992) (en banc)). The Board acknowledged, however, that unlike § 3.105(a), § 3.105(d) does not limit, in determining the propriety of severance, the evidence that may be considered to the evidence that was before the regional office at the time of the initial decision, but instead requires the consideration of all the accumulated evidence. R. at 24. The Board then stated that, “under either basis for finding [clear and unmistakable error],” the May 1998 regional office decision granting service connection for post-traumatic stress disorder was based on clear and unmistakable error and therefore severance of Mr. Roberts’ benefits was proper. Id.
The Board, purporting to apply § 3.105(d), found that severance was proper in Mr. Roberts’ case for three alternative reasons, and I will address each in turn.

1. Correct facts not before the adjudicator.

The Board determined that the May 1998 grant of service connection contained clear and unmistakable error because the correct facts, as they were known at the time, were not before the regional office because of Mr. Roberts’ fraudulent state *441 ments regarding Ms claimed stressor. Despite the Board’s acknowledgment that § 3.105(d) requires consideration of all the accumulated evidence of record, the Board essentially applied the standard of § 3.105(a), Damrel, and Russell, and limited its discussion of clear and unmistakable error to the facts and evidence before the regional office at the time of its May 1998 decision. This was error.[15] See Stallworth v. Nicholson, 20 Vet.App. 482, 488 (2006) (“Severance of service connection based on any standard less than that established by § 3.105(d) is erroneous as a matter of law.”); Venturella, 10 Vet.App. at 343.
To put this very technical discussion into its proper context, what must be proven by VA at this stage of the adjudication is that the continuation of Mr. Roberts’ service connection would be clearly and unmistakably erroneous. 38 C.F.R. § 3.105(d) (“[Sjervice connection will be severed only where evidence establishes that it is clearly and unmistakably erroneous (the burden of proof being upon the Government).” (emphasis added)). Without a discussion by the Board of all of the accumulated evidence, including that which postdates the May 1998 regional office decision, the Board’s determination that service connection is clearly and unmistakably erroneous is not in accordance with the law, and therefore its conclusion that severance of service connection is proper cannot stand. 38 U.S.C. § 7261(a)(3)(A); Stallworth, 20 Vet.App. at 489; Eddy v. Brown, 9 Vet.App. 52, 57 (1996) (holding that the Court’s review of a Board finding of clear and unmistakable error is limited to determining whether the Board’s conclusion was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and whether it was supported by an adequate statement of reasons or bases),
a. VA’s Knowledge of the Existence of Alternative Stressors
In this case, the accumulated evidence of record includes, clearly and specifically, an alternative stressor — an incident in which Mr. Roberts claimed he was assaulted by the shore patrol, placed in a straight jacket, injected with Thorazine, and placed in bed restraints overnight in a psychiatric facility. Although the Board acknowledged that there was evidence of this alternative stressor, the Board stated that it did not need to consider the possibility of an alternative stressor because Mr. Roberts identified no additional stressors in his initial claim for benefits, and because the May 1998 regional office decision that *442 granted benefits for post-traumatic stress disorder was based only on the Gary Holland stressor, which was later found to be fraudulent. R. at 28.
Neither rationale is sufficient to allow the Board to ignore the clearly asserted alternative stressor. First, notwithstanding the Secretary’s assertion at oral argument and the Board’s insistence that Mr. Roberts raised other possible stressors only after VA proposed to sever his benefits, Mr. Roberts has, in fact, alleged at least one additional or alternative stressor consistently since his initial application for VA benefits in August 1993.[16] See R. at 270-73 (August 2003 initial application for benefits that indicates that his condition began December 13, 1969, the date of the shore patrol incident), 409 (February 2002 letter from Mr. Roberts to Milwaukee, Wisconsin, regional office stating that his “symptoms” of post-traumatic stress disorder included his “hospitalization and restraint in a straight jacket and injected with Thorazine”), 906 (March 2003 private psychology consult that identifies the Gary Holland stressor as well as “at least 2 near tragedies” in service related to airplanes that Mr. Roberts was on that he believed were going to crash), 939 (April 2004 letter from Mr. Roberts to VA in which he asserts both the Gary Holland incident and the shore patrol incidents as stressors causing his post-traumatic stress disorder), 1185-89 (September 2003 regional office hearing at which Mr. Roberts asserted that the December 1969 shore patrol incident contributed to his post-traumatic stress disorder diagnosis). Second, the Board’s assertion that, because the May 1998 regional office decision was based on a single stressor, it need not consider any alternative stressors, falters against the requirement of § 3.105(d) that the accumulated evidence of record be evaluated to determine whether service connection “is” — that is, presently — clearly erroneous. The Board applied the standard of § 3.105(a), but, as discussed at length above, this was improper and prevented the Board from adequately considering all of the accumulated evidence of record.
b. Requirement that VA Develop All Claimed Stressors for Post-Traumatic Stress Disorder
In my view, because § 3.105(d) requires evaluation of all of the accumulated evidence, it follows that the Secretary must develop, if needed, facts regarding any feasible alternative bases for continuing the award of service connection that are reasonably raised by the record, and certainly when specifically identified by the claimant, prior to severing service connection. See Robinson v. Shinseki, 557 F.3d 1355, 1362 (“[Wjhere the claimant has raised an issue of service connection, the evidence in the record must be reviewed to *443 determine the scope of that claim.”)- Despite having notice of additional alleged stressors, particularly of the shore patrol incident, at the outset of the adjudication, VA did not develop the facts surrounding those stressors, content instead to rest its decision to award disability benefits on a single stressor later found to be fraudulent.
Because VA determined in May 1998 that one of the stressors claimed by Mr. Roberts had been adequately corroborated to support a finding of service connection for post-traumatic stress disorder, VA was not obligated at that time to develop evidence pertaining to the other claimed stressors. However, I believe that — certainly before VA may sever service connection in a ease such as Mr. Roberts’ — where VA is aware of other stressors that could serve as a basis for continuing the award of post-traumatic stress disorder, VA must consider the validity of the other potential stressors. After such review, if VA determines that the accumulated evidence regarding another potential stressor is not adequately developed, it should take appropriate steps to further develop that evidence. In this case, such development would have included seeking evidence to corroborate or dispel the existence of an alternative claimed stressor and, if corroborated, obtaining a medical opinion to determine whether the alternative stressor is sufficient to warrant a diagnosis of post-traumatic stress disorder.
c. Importance of Diagnoses of Post-Traumatic Stress Disorder
I further note that, at the time of VA’s August 2004 proposal to sever service connection, the record contained evidence showing that Mr. Roberts had received multiple diagnoses of post-traumatic stress disorder. There is absolutely no medical evidence in the record demonstrating that Mr. Roberts is not, in fact, severely mentally ill. See R. at 394-97 (April 1999 VA mental disorders examination); 449 (October 2002 letter from VA outpatient clinic psychiatrist stating that Mr. Roberts’ post-traumatic stress disorder was caused by “the traumatic event [he was] exposed to in Italy”); R. at 904-07 (March 2003 private opinion by Donald Derozier, Ph.D., who reviewed “selected records” provided by Mr. Roberts, personally interviewed Mr. Roberts, and concluded “to a reasonable degree of psychological probability that the extant diagnostic coding systems at the time of the death of [Mr. Holland] under traumatic circumstances, subsequent maladjustment and psychological symptom appearances ... could reasonably have made a post-traumatic stress disorder diagnosis,” and that such post-traumatic stress disorder “probably occurred prior to 1980”); R. at 947-49 (April 2003 report from Dr. Derozier, who acknowledged the December 1969 shore patrol incident; stated, referring to a July 1992 VA communication, that the shore patrol event “was not mentioned in the context of [post-traumatic stress disorder], and therefore perceived as not relevant;” opined that “subsequent psychological problems were possibly related to the traumatic loss of [Mr. Roberts’] friend and subsequent associated events;” and concluded “to a reasonable degree of psychological probability that Mr. Roberts experienced a psychiatric condition that could have been or might have been diagnosed as [post-traumatic stress disorder] had such diagnoses been extant and customary while he was in active duty”). Indeed, even a November 2004 VA medical opinion affirmatively stated that Mr. Roberts was not thought to be faking his symptoms. Additionally, by the time the Board rendered its August 2005 decision, a May 2005 private medical opinion diagnosing Mr. Roberts with post-traumatic stress disorder was also of record. While all of the *444 diagnoses rendered rely at least in part on the Gary Holland stressor, none of them-save the November 2004 VA medical opinion, which I find inadequate for reasons that will be discussed below — indicates that, absent that single stressor, Mr. Roberts would not meet the DSM-IV criteria for post-traumatic stress disorder.
Terminating a veteran’s long-held monthly disability compensation is a serious matter having profound consequences. Recognizing this, VA promulgated § 3.105(d), which permits severance only when service connection is clearly and unmistakably erroneous, and states that VA bears the “high burden of proof’ of showing that this is so. Graves v. Brown, 6 Vet.App. 166, 170 (1994). VA had notice of other stressors that might support a diagnosis of post-traumatic stress disorder and of the fact that Mr. Roberts had been found — multiple times — to be mentally ill. In my opinion, VA accordingly had a duty, before it imposed the most serious sanction available, to consider the stressors identified in the record and, if necessary after proper consideration, to develop evidence so that it could determine whether Mr. Roberts was still entitled to disability benefits for post-traumatic stress disorder based on any other stressors. This obligation exists independently of, and despite, Mr. Roberts’ false statements regarding his involvement in the attempted rescue of Mr. Holland. In the absence of such consideration and possible evidentiary development, I cannot conclude that VA has met its heavy burden of showing that service connection “is clearly and unmistakably erroneous.” 38 C.F.R. § 3.105(d) (emphasis added).

2. Statutory or regulatory provisions incorrectly applied.

The Board also determined that the May 1998 regional office decision granting service connection contained clear and unmistakable error because the regional office incorrectly applied 38 C.F.R. § 3.304(f) when it accepted as corroboration of Mr. Roberts’ claimed stressor the death certificate of Mr. Holland. Here, too, the Board appeared to apply the standard of § 3.105(a) rather than § 3.105(d) and focused solely on the “record and law that existed at the time of’ the May 1998. R. at 24. Even if the standard of § 3.105(a) were applicable, however, the error identified by the Board does not constitute clear and unmistakable error under this standard. As discussed in footnote 9, under § 3.105(a), the failure to develop evidence is not the type of error that can rise to the level of clear and unmistakable error in a prior decision. Cook, 318 F.3d at 1344; Caffrey, 6 Vet.App. at 384 (“VA’s breach of the duty to assist cannot form a basis for a claim of [clear and unmistakable error] because such a breach creates only an incomplete rather than an incorrect record.”). Therefore, for the reasons given in Part C.l supra, I would conclude that the Board’s finding of clear and unmistakable error on this issue is also not in accordance with the law.[17] 38 U.S.C. § 7261(a)(3)(A).

*445
3. Change in diagnosis.

Finally, the Board determined, based on the November 2004 VA medical opinion provided by Dr. Berger, that Mr. Roberts no longer had a confirmed diagnosis of post-traumatic stress disorder and that the diagnosis on which service connection was based was therefore clearly erroneous. The relevant part of § 3.105(d) provides:
A change in diagnosis may be accepted as a basis for severance action if the examining physician or physicians or other proper medical authority certifies that, in the light of all accumulated evidence, the diagnosis on which service connection was predicated is clearly erroneous. This certification must be accompanied by a summary of the facts, findings, and reasons supporting the conclusion.
38 C.F.R. § 3.105(d).
a. Examination Inquiry
I begin my discussion of the adequacy of the medical opinion in this case by considering the contents of the October 2004 “Compensation and Pension Exam Inquiry” provided to the opining psychiatrist by VA. See R. at 1365-75. “[B]asic fair play requires that evidence be procured by the agency in an impartial, unbiased, and neutral manner,” and this requirement applies to the solicitation of medical opinions. Austin v. Brown, 6 Vet.App. 547, 552 (1994); see also Bielby v. Brown, 7 Vet.App. 260, 268 (1994) (finding improper the Board’s reliance on an independent medical opinion where the Board constrained the scope of inquiry in the engagement letter, thereby “limiting [the examiner’s] investigation and tainting the results”). I believe that the VA inquiry that resulted in the November 2004 VA medical opinion by Dr. Berger does not meet this standard.
In its inquiry, VA stated that the claims file would be forwarded to the opining psychiatrist and requested that the psychiatrist allow sufficient time to review the five-volume file. VA, however, also stated that “pertinent evidence” in the file had been tabbed and that “[m]uch of the other documentation [in the file] consists of duplicate copies of the claims folder submitted by the veteran, copies of VA Court decisions, and copies of medical text and information obtained over the internet.” R. at 1365-66. It is evident from these statements that VA attempted to limit the opining psychiatrist’s review of the claims file to the evidence VA deemed “pertinent” by denigrating the value of the remaining documents in the claims file. This type of limiting statement is never appropriate, and certainly not in a case where severance of service connection may rest on a change in diagnosis, because § 3.105(d) expressly requires that a medical professional who certifies a change in diagnosis make such a determination “in light of all accumulated evidence.” 38 C.F.R. § 3.105(d); Andino v. Nicholson, 498 F.3d 1370, 1372 (Fed.Cir.2007) (“The plain language of the regulation provides that service connection can only be terminated when a medical professional certifies that her review of all the evidence indicates that the prior diagnosis is ‘clearly erroneous.’ ” (quoting § 3.105(d))); see also Colayong v. West, 12 Vet.App. 524, 535 (1999) (finding improper the Board’s reliance on a medical opinion obtained through an engagement letter that “gave the examiner discretion as to whether to review certain prior medical records”).
VA also informed the opining psychiatrist of the proposed severance of Mr. Roberts’ benefits for post-traumatic stress disorder and listed several findings of fact, including that “[t]he diagnosis of [post-traumatic stress disorder] is not acceptable for VA rating purposes as it is based on a *446 stressor determined to be fraudulent,” that “[t]he evidence in its entirety contains many discrepancies in testimony by the veteran,” and that “the medical opinions of record are based in part on fraudulent testimony and/or unreliable history provided by the veteran.” R. at 1366-67. Taken together, these statements telegraph the conclusion apparently sought by VA: A diagnosis of post-traumatic stress disorder is not warranted because the stressor on which the diagnosis was initially based was fraudulent, and, thus, there should be no further finding of post-traumatic stress disorder. Further, the vague nature of the second and third quoted statements impermissibly taints all of Mr. Roberts’ statements regarding his condition, including those regarding any nonfraudulent stressors he might have asserted throughout his claim.
Additionally, VA listed only the accident and failed rescue attempt of Mr. Holland as Mr. Roberts’ reported in-service stres-sor and stated that “[t]he first report of the in[-]service trauma is documented in the [March 1991] VA[] Mental Health examination].” Id. Although a summary of Mr. Roberts’ medical history provided to the psychiatrist included reference to the December 13, 1969, shore patrol incident and his subsequent hospitalization, it did not include that incident in its summary of the March 1991 mental health examination. VA’s instructions to the examiner repeatedly ignored the shore patrol incident as a possible stressor, instead focusing the opining psychiatrist’s attention solely on the Gary Holland incident. The examination inquiry also contained a statement that, after VA proposed to sever service connection, Mr. Roberts contacted VA “with questions regarding other stres-sors that might support a diagnosis of [post-traumatic stress disorder].”[18] R. at 1368, 1374. As noted above, however, Mr. Roberts repeatedly raised other potential stressors prior to November 2004, at least one of which was supported by service medical record entries. Because VA indicated in its inquiry that there was only one possible stressor to support a diagnosis of post-traumatic stress disorder and implied that Mr. Roberts had suggested additional stressors only after VA proposed to sever service connection — as if to indicate that consideration of other stressors would be improper — Mr. Roberts was deprived of the possibility of obtaining an impartial opinion that took into account all of his claimed stressors.
Finally, the information provided to the opining psychiatrist also included a detailed summary of the 2004 VA Inspector General’s report, much of which was irrelevant to the needs of the reviewing psychiatrist. R. at 1374-75. I can discern no purpose for VA to include such an inflammatory summary beyond attempting to skew the resulting opinion in favor of a finding that a diagnosis of post-traumatic stress disorder was not warranted. This is particularly so in light of the fact that VA had already stated that the Gary Holland stressor had been found to be fraudu *447 lent and that the record was replete with inaccurate statements from Mr. Roberts.
For all of these reasons, I would conclude that the October 2004 VA inquiry does not comport with “fair process.” See Austin, 6 Vet.App. at 551-52. Therefore, I would also conclude that the Board’s determination that severance of service connection was proper based on a change in diagnosis likewise does not comport with fair process, because it is based on an opinion obtained by a process that did not ensure an impartial opinion. Id. at 552. Accordingly, I would hold that the Board’s determination that severance of service connection for post-traumatic stress disorder was proper is not in accordance with the law. 38 U.S.C. § 7261(a)(3)(A).
b. November 2004 VA Medical Opinion
Assuming the “Compensation and Pension Exam Inquiry” was proper, however, would not change my view on this issue, because I also believe that Dr. Berger’s opinion is inadequate to satisfy the high standards imposed by § 3.105(d). As noted above, § 3.105(d) permits severance of service connection based on a change in diagnosis where “the examining physician or physicians or other proper medical authority certifies that, in the light of all accumulated evidence, the diagnosis on which service connection was predicated is clearly erroneous.” 38 C.F.R. § 3.105(d). The regulation further requires that such certification be accompanied by a summary of the facts, findings, and reasons supporting the examining physician’s conclusions. Id.
In November 2004, Dr. Berger responded to VA’s inquiry in a four-page opinion. R. at 1500-03. He discussed Mr. Roberts’ preservice medical history and then stated:
The primary traumas reported by the veteran, which are clearly documented in the claims file ..., include an incident where he witnessed a supposed friend of his being killed; the next incident was when he was on a line crew flight and there was ... a hard landing; however, there were no injuries. In another incident, there was a nose wheel problem when he was on a flight and, again, the plane almost crashed, but there was no injury to anyone involved. The final trauma he reported experiencing ... was being forced to watch a video in which there was an explosion on a U.S. naval ship-Having to watch this video was reportedly traumatic for the veteran. In reviewing these traumas with the note that the [Inspector [G]eneral’s office had investigated the incident which had originally caused service connection for the veteran, it is quite clear that the veteran had not experienced trauma which would be sufficient to cause post-traumatic stress disorder. It is quite clear that the basis for his post-traumatic stress disorder was based upon his alleged observation of the death of his supposed “friend.” Additionally there was no documented evidence of the other reported traumas.
As was shown by the [Inspector General’s] report, since the veteran was not present during this incident, there does not appear to be any basis for his claim of post-traumatic stress disorder. It is, however, noted that his initial compensation and pension[] [examination] had shown that he was experiencing dysthy-mia and mixed personality disorder with antisocial and borderline traits. This was noted on a couple of subsequent exams after March of 1991. It was not until 1998 that a diagnosis of [post-traumatic stress disorder] was determined based upon him witnessing the death of his supposed “friend.”
The issue of malingering was considered, as it appears his claim of a trauma was not substantiated. Malingering was *448 not felt to be an appropriate diagnosis in this case, as the veteran has reported and was assessed] as having actual ongoing mental health symptoms such as depression], anxious mood, angry outbursts, violence toward family ... and additional symptoms related to a mixed personality disorder with antisocial and borderline traits and dysthymia. Therefore, it does not appear that he is attempting to fake his symptoms but to use them to attain disability. However, his report of trauma does appear to be fraudulent, according to the [Inspector General], and therefore his symptoms would not be consistent to a diagnosis for [post-traumatic stress disorder]. His symptoms would rather be consistent to his original diagnosis in his first claims file compensation and pension exam in March 1991.... At that time he had been diagnosed [with] dysthymia [and] mixed personality disorder with antisocial and borderline traits.
The progression of his pre-existing (conduct disorder) does not appear to have been aggravated by the military.... It is ... my opinion that his current symptoms and diagnosis are part of a natural progression of his pre-existing illness and may have been aggravated by a non-serviee[-]related incident (myocardial infarction) or other situational incident (loss of job).
R. at 1501-02. In rendering its decision that severance of service connection was proper due to a change in diagnosis, the Board relied exclusively on Dr. Berger’s opinion to find that the strict requirements of § 3.105(d) had been met. R. at 27. I cannot agree.
Although Dr. Berger did discuss four “primary traumas” or stressors, these incidents appear to have been culled solely from a March 2003 private medical report. See R. at 906. There is no discussion in Dr. Berger’s opinion of the shore patrol incident, despite multiple references to that event in the record — including in other medical reports — as a possible stressor and despite VA’s mentioning that event twice in its inquiry. Dr. Berger acknowledged that Mr. Roberts had been assessed as having “actual ongoing mental health symptoms,” but did not acknowledge Mr. Roberts’ multiple previous diagnoses of post-traumatic stress disorder and did not attempt to reconcile those diagnoses with his finding that a diagnosis of post-traumatic stress disorder was not warranted. I therefore cannot conclude that Dr. Berger considered “all accumulated evidence” as required by § 3.105(d). See Andino, 498 F.3d at 1372.
Moreover, Dr. Berger’s conclusion that Mr. Roberts’ symptoms were not consistent with post-traumatic stress disorder solely because the VA Inspector General’s report found the Gary Holland stressor to be fraudulent is not based on sound reasoning because he failed to discuss the evidence pertaining to the shore patrol incident. See Nieves-Rodriguez v. Peake, 22 Vet.App. 295, 304 (2008) (“It is the factually accurate, fully articulated, sound reasoning for the conclusion ... that contributes probative value to a medical opinion.”). Given the evidence of alternative stressors, it is not sufficient for Dr. Berger to simply opine that because a particular stressor is no longer part of the diagnostic equation, symptoms that had heretofore been diagnosed as post-traumatic stress disorder must no longer be consistent with that condition. Such a conclusion hardly allows an adjudicator “to conclude that a medical expert has applied thorough medical analysis to the significant facts of the particular case.” Id. Dr. Berger expressly found that Mr. Roberts was not faking his symptoms, but did not consider other possible causes of post-traumatic stress disorder that might account for such symptoms, *449 despite Mr. Roberts’ repeated references in the record to an alternate stressor.
In light of this discussion, I would conclude that the Board’s determination that the November 2004 YA medical opinion satisfied the requirements of § 3.105(d) is clearly erroneous. D‘Aries v. Peake, 22 Vet.App. 97, 104 (2008); see 38 U.S.C. § 7261(a)(4); Nolen v. Gober, 14 Vet.App. 183, 184 (2000); Gilbert v. Derwinski, 1 Vet.App. 49, 52 (1990). Therefore, I would hold that the Board’s determination that severance of service connection was proper based on a change in diagnosis was not in accordance with the law. 38 U.S.C. § 7261(a)(3)(A). Having found all of the Board’s reasons for severing service connection in this case not in accordance with the law, I would reverse the Board’s decision affirming severance of service connection.
D. Congress’ Statutory Scheme Regarding Fraud
To be clear, I certainly do not condone obtaining or retaining VA benefits through fraud. I believe, however, that the consequences of severing service connection are so severe that VA must, even in cases where evidence of fraud is present, follow its prescribed procedures. Further, I believe those procedures include developing reasonably raised alternative bases for continuing service connection for the condition for which severance is proposed. It is my view that VA’s failure to fulfill its duty to assist Mr. Roberts in developing an alternative theory of entitlement to continued service connection for post-traumatic stress disorder and the majority’s condoning of that failure are based solely on the admitted repugnance of Mr. Roberts’ postservice fraudulent actions. The majority and VA would deny Mr. Roberts, who, by all accounts, served his country honorably, fair process in the pursuit of the severance of his VA disability benefits. In essence, the majority today erects a total bar to benefits, not just for Mr. Roberts, but for any veteran who commits an act of fraud in the pursuit of his benefits. This position ignores the statutory and regulatory scheme created by Congress to deal with acts of fraud in obtaining or retaining VA benefits.
If Congress wishes to create a total bar to benefits for all veterans who commit fraud in obtaining or retaining those benefits, it may certainly do so and has, in fact, done so with respect to certain veterans. See 38 U.S.C. § 6103(a) (“Whoever knowingly makes or causes to be made or conspires, combines, aids, or assists in, agrees to, arranges for, or in any way procures the making or presentation of a false or fraudulent affidavit, declaration, certificate, statement, voucher, or paper, concerning any claim for benefits under any of the laws administered by the Secretary ... shall forfeit all rights, claims, and benefits under all laws administered by the Secretary.”); 38 U.S.C. § 6103(d)(1) (“After September 1, 1959, no forfeiture of benefits may be imposed under this section or section 6104 of this title upon any individual who was a resident of, or domiciled in, a State at the time the act or acts occurred on account of which benefits would, but not for this subsection, be forfeited unless such individual ceases to be a resident of, or domiciled in, a State before the expiration of the period during which criminal prosecution could be instituted.” (emphases added)); see also 38 C.F.R. § 3.901(d) (2009) (limiting section 6103 to cases where (1) “the person was not residing or domiciled in a State ... at the time of commission of the fraudulent act,” (2) “the person ceased to be a resident of or domiciled in a State ... before expiration of the period during which criminal prosecution could be instituted,” or (3) “[t]he fraudulent act was committed in the Phil *450 ippine Islands”). In dealing with acts of fraud committed by veterans domiciled in the United States, however, Congress has elected to use the tools of criminal prosecution and the imposition of civil penalties under the Fraud Civil Remedies Act rather than forfeiture. See 31 U.S.C. §§ 3801-3812; Trilles v. West, 13 Vet.App. 314, 321-22 (2000) (en banc) (discussing the difference between administrative forfeiture for fraud for claimants who are residents or domiciliaries of localities outside the United States under 38 U.S.C. § 6103 and criminal prosecution for fraud for claimants who reside or are domiciled within the United States); 38 C.F.R. Part 42.
In essence, I believe that the fact that Mr. Roberts committed fraud in receiving VA benefits does not relieve VA of its duty to afford him the evidentiary and procedural protections provided for in VA’s own regulations, including the duty to assist him in developing evidence. See Bolton v. Brown, 8 Vet.App. 185, 193 (1995), (Stein-berg, J., concurring) (“[W]e cannot now lightly infer that the duty to assist a veteran in developing his claim applies any less to an incarcerated veteran than to a non-incarcerated veteran.” (citing Wood v. Derwinski, 1 Vet.App. 406 (1991))). For these reasons, I must strongly dissent.

. It is true, as the majority states, that the Court in Ventigan held that the Board erred in applying 38 C.F.R. § 3.105 to find that severance of VA benefits was proper, and that the Board should have applied 38 U.S.C. § 5112(b)(9). However, I believe that case was wrongly decided and ought to be overturned by the Court today because I believe that § 3.105(d) unquestionably applies even in cases of fraud. Nevertheless, Ventigan is distinguishable from Mr. Roberts' appeal because, in Ventigan, the appellant’s benefits were not protected under § 3.957 because they had not been in effect for 10 or more years.

. Based on this preamble, the majority also attempts to conflate cases in which service connection was "clearly illegal” with cases in which an award of service connection was based on an act of commission or omission (which includes fraud). See ante at 424; 38 C.F.R. § 3.105. The majority does so in order to rely on cases that are easily factually distinguishable from Mr. Roberts' case for the proposition that § 3.105(d) does not apply where service connection has been found to be based on fraud. See id. (citing Allen, 21 Vet.App. at 61-62; Venturella v. Gober, 10 Vet.App. 340, 342 (1997)). Because the illegality in those cases involved appellants who did not have the requisite service to be entitled to disability compensation, while Mr. Roberts does have the requisite service to receive such compensation, reliance by the majority on those cases is misplaced.

. Subsections (9) and (10) of 38 U.S.C. § 5112(b) provide:
(b) The effective date of a reduction or discontinuance of compensation, dependency and indemnity compensation, or pension—
(9) by reason of an erroneous award based on an act of commission or omission by the beneficiary, or with the beneficiary’s knowledge, shall be the effective date of the award; and
(10) by reason of an erroneous award based solely on administrative error or error in judgment shall be the date of last payment.

. In such cases, the penalty for an act of commission or omission is clear: Because the effective date of severance will be the effective date of the award, the veteran will be required to repay VA all of the benefits he received. In typical severance cases, where there is no need to apply the substitute effective date provisions of the preamble of § 3.105, no repayment is required.

. I discuss the majority's erroneous interpretation of 38 C.F.R. § 3.957 below.

. Proposed § 5.83 is the proposed rewrite of 38 C.F.R. § 3.103, governing procedural due process and appellate rights. 70 Fed.Reg. 24,683 (May 10, 2005). Proposed § 5.83(c) is the rewrite of § 3.103(b)(3), which requires notice to the veteran contemporaneous with VA’s adverse action in circumstances not applicable here. 70 Fed.Reg. 24,687-88.

. VA reports that proposed § 5.165 "applies only to reductions or discontinuances of erroneous awards." 72 Fed.Reg. 22,779.

. I also note .that the Secretary has, in fact, expressly explained the substantive changes made in this portion of the proposed rewrite. See 72 Fed.Reg. 28,776 ("Except as provided below, no substantive changes are intended to these provisions”; "This is a substantive change based upon expanding current § 3.304(d)”; "This substantive change is consistent with current § 3.304(f)(2), pertaining to posttraumatic stress disorder claimed by a former prisoner of war.”). It is true that the Secretary has also expressly stated in some cases that no substantive change has been made to a particular rule, but without fail, these circumstances are limited to rephrasing regulations or substituting one word for another. See, e.g., 72 Fed.Reg. 28,773 ("Note that although current § 3.1(p) uses the terms 'claim' and 'application' interchangeably, we propose to only use the term 'claim' in part 5 ... when referring to a formal or informal communication in writing requesting a determination of entitlement or evidencing a belief in entitlement to a benefit.... Thus, the term 'claim' would have the same meaning in Part 5 as it currently does in Part 3; no substantive change is intended.”); 72 Fed.Reg. 28,-774 ("We intend no substantive changes to this regulation by eliminating the term 'informal claim.’ The term 'claim' necessarily embraces all of the types of claims listed in the regulations, including informal and formal claims.”); 72 Fed.Reg. 28,775 ("Although we have changed the language taken from these two sources in order to make the proposed rule easier to understand, we intend no change in the substance they convey.”).

. Even assuming that a finding of clear and unmistakable error in the initial decision granting service connection is a necessary component of a decision severing service connection under § 3.105(d), the Board’s finding of clear and unmistakable error is not in accordance with the law. 38 U.S.C. § 7261(a)(3)(A). The first prong of the analysis under § 3.105(a) provides that clear and unmistakable error may exist in a prior decision where, among other conditions, "the correct facts, as they were known at the time, were not before the adjudicator.” Damrel, 6 Vet.App. at 245. The Board stated that, because of Mr. Roberts' fraudulent statements, the correct facts were not before the regional office in May 1998. R. at 26. However, the correct facts were certainly available to the regional office at the time of the May 1998 decision, had VA chosen to obtain the 1969 Navy investigation report to attempt to corroborate Mr. Roberts’ claimed stressor. Instead, it was VA that accepted only Mr. Holland’s death certificate as adequate corroboration of the claimed stressor. To find clear and unmistakable error in the prior decision based on VA’s failure to obtain records to dispute Mr. Roberts' version of events would be analogous to finding clear and unmistakable error in a prior decision based on VA's failure to obtain records to satisfy its duty to assist, which is not permitted. See Cook v. Principi, 318 F.3d 1334, 1344 (Fed.Cir.2002); Caffrey v. Brown, 6 Vet.App. 377, 384 (1994).

. The majority also contends that Mr. Roberts’ failure to submit evidence within the 60-day period following notice of the proposed severance decision precludes him from now arguing that service connection was erroneously severed. See ante at 428. In this regard, the majority curiously ignores the fact that VA had evidence of the stressor involving the shore patrol at least as early as 1991. See, e.g., R. at 159 (March 1991 VA examination at which Mr. Roberts reported the shore patrol incident to the examiner); R. at 409 (February 2002 statement from Mr. Roberts requesting an earlier effective date for compensation benefits related to post-traumatic stress disorder); R. at 939 (April 2003 correspondence from Mr. Roberts to the regional office discussing the shore patrol incident as a documented in-service stressor); R. at 1197 (September 2003 hearing at which Mr. Roberts testified regarding the stressor involving the shore patrol incident). Because the record already contained evidence regarding the alternate stressor, there was no need for Mr. Roberts to submit additional evidence to VA regarding this matter within the 60-day period.

. Again, even assuming that a finding of clear and unmistakable error in the initial decision is a necessary component of a decision severing service connection, the Board's decision is not in accordance with the law. 38 U.S.C. § 7261(a)(3)(A). The May 1998 regional office accepted Mr. Holland's death certificate as corroboration of Mr. Roberts’ claimed stressor. The Board’s finding that the death certificate is not sufficient to cor-robórate the claimed stressor under § 3.304(f) amounts to a reweighing of the evidence available to the regional office at the time of its decision. As the Board expressly acknowledged in its recitation of the clear and unmistakable error standard under § 3.105(a), disagreement about the weight assigned to the evidence in the prior decision does not rise to the level of clear and unmistakable error. Russell, 3 Vet.App. at 313-14.

. I note again that VA has consistently argued, and the majority reasserts, that Mr. Roberts did not submit additional evidence during the 60-day timeframe allotted. I question this assertion in light of VA’s statement to the opining psychiatrist on October 5, 2004 (less than 60 days after the August 18, 2004, notice of proposed severance), that Mr. Roberts had contacted VA with "questions” about additional stressors. I do not presume to know the precise nature and content of the contact between Mr. Roberts and VA that prompted this statement, but it appears that VA was at least on notice of the possibility of additional stressors that might support the continuation of service connection for post-traumatic stress disorder and may have violated its duty to assist in the development of evidence regarding those stressors.